LAND FINANCE CORPORATION *v.* SHERWIN ELECTRIC COMPANY.

January Term, 1928.

Present: WATSON, C. J., POWERS, SLACK, and MOULTON, JJ., and
THOMPSON, Supr. J.

Opinion filed May 2, 1928.

*Chas. F. Black* for the defendant.

*Max L. Powell* for the plaintiff.

THOMPSON, Supr. J. This is an action of contract on two trade acceptances drawn by the Autocrat Sales & Distributing Corporation on the defendant and accepted by it, payable to the order of the drawer, and indorsed by it to the plaintiff before maturity. The defendant filed an answer setting up fraud in procuring the acceptances and that the plaintiff was not a holder in due course, not having taken said acceptances in good faith. Trial by jury. At the close of the evidence the court directed a verdict for the plaintiff, to which the defendant was allowed an exception. An exception was also taken to the judgment on the verdict.

The plaintiff is a corporation with its office and place of business in New York City, and, at the time of the transactions involved in this suit, was engaged in purchasing book accounts and commercial paper of merchants. One Leopold Blumberg, who was the only witness for the plaintiff, except Arthur E. Sherwin who was called to prove the acceptances, is the president and treasurer of the plaintiff, and has always owned or controlled all of its capital stock. The defendant is a partnership consisting of George D. Sherwin and Arthur E. Sherwin, and is engaged in the electrical business at Burlington, Vt. The Autocrat Sales & Distributing Corporation is, or was, a corporation engaged in selling electric dishwashing machines, with its headquarters at 40 West 33rd Street, New York City. One B. M. Ainsworth was its general manager. This corporation is hereinafter referred to as the Autocrat Company.

There were originally three acceptances, all bearing the date of April 18, 1925, each for the sum of two hundred and thirty-two dollars and fifty cents, and respectively payable on sixty, ninety, and one hundred and twenty days after date. They are printed with the exception of the date, name, and residence of the defendant, name of the bank through which they

are payable, and the name of B. M. Ainsworth, all of which are in writing. On the face of each acceptance there are printed in small type the words: "The obligation of the acceptor hereof arises out of the purchase of goods from the drawer." The defendant paid the first acceptance, but refused to pay the two on which this action was brought.

The plaintiff did not rest after the acceptances had been introduced in evidence, but counsel, evidently expecting that the defendant would introduce evidence tending to prove fraud in the procuring of the acceptances, said that they wanted to put the plaintiff on to prove that he was a holder in due course, as he had to return to New York that night, and Mr. Blumberg was then called to the witness stand.

He testified that he lived in New York City, that he was a lawyer by profession and had practiced law for over twenty years, that he was president and treasurer of the Land Finance Corporation, and owned or controlled all of its capital stock.

He first testified that this corporation had been in business since 1922, but, in cross-examination, testified that he had previously been connected with a similar concern called the Financial Guild; that it went out of business in the early part of 1925, and he continued under the Land Finance Corporation.

He further testified that the first he ever knew of the Autocrat Company was in the early part of April, 1925, when a Miss Wood, a broker who occasionally brought business to his office, brought Mr. Ainsworth, the manager of the Autocrat Company, to his office.

Ainsworth wanted to sell him some of their trade acceptances, and, in response to questions, told Blumberg that they were selling a dishwashing machine; that they had been in business only a few months; that they took trade acceptances in payment for the merchandise they sold payable in sixty, ninety, and one hundred and twenty days after date; that a concern called the Ætna Finance Corporation had purchased some of their trade acceptances, but they were "over-loaded" and did not want to carry any more at present. In response to an inquiry about the same, Ainsworth showed Blumberg, and later sent him, a copy of an accountant's report of the financial condition of the Autocrat Company. This report was not satisfactory to Blumberg, as he thought it did not show assets enough to protect him in case of loss. He told Ainsworth that

it was not satisfactory, and that before they would buy any of the trade acceptances he would have to leave them at the office; that they would have to first verify the authenticity of the signatures and also the credit standing of the acceptors, and, if they were satisfied as to those facts, they would buy whatever paper they might choose to buy.

After testifying to the foregoing talk with Ainsworth, Blumberg was asked what other investigation he made of the Autocrat Company and its business, and he replied: "We made no further investigation of the Autocrat Company because we were not giving them any credit. When we purchased the trade acceptances, in addition to our inquiries at the banks to verify the authenticity of the signatures and the credit standing of the acceptors, we checked up with the credit agency—Dun's —to find out the credit standing of the acceptors."

Blumberg told Ainsworth that he wanted some credit insurance. A short time later Ainsworth told him that he made application to the National Surety Company for this insurance, but, as the Surety Company already had an outstanding policy of credit insurance, it refused to issue a second policy, and it was suggested that the plaintiff participate in the credit policy which the Ætna Finance Company had. A few days later a man representing the Ætna Finance Company went to Blumberg's office and talked this matter over with him. In the course of the talk Blumberg asked this man, whose name does not appear, how they got along with the Autocrat Company, and he said, "Fine," that they found things satisfactory, but they had over sixty thousand dollars of their paper and did not want to carry any more. Shortly after this a letter was drafted by Blumberg and a Mr. Cohen, who was attorney for the Ætna Finance Company, which was signed by that Company and sent to the plaintiff. It appears from this letter that the policy of credit insurance was issued to the Autocrat Company and assigned by it to the Ætna Finance Company. In this letter the Ætna Finance Company "agree to and do hereby release unto you (Land Finance Corporation) any and all monies which will be paid by the National Surety Co. for and on account of any loss of any accounts and/or trade acceptances purchased by you from the Autocrat Sales & Distributing Corp. and covered by such policy and will immediately upon receipt of any such monies pay over the same to you." It also appears from this

letter that the place of business of the Ætna Finance Company was at 40 West 33rd Street, New York City, the same address where the headquarters of the Autocrat Company were.

In direct examination, Blumberg testified that he wanted credit insurance "in case the bankers of any of the acceptors of the trade acceptances were unsatisfactory," but the inference to be drawn from his testimony in cross-examination and in re-direct examination is that he wanted this insurance to protect himself from any loss he might sustain because of the non-payment of acceptances which he might buy. In cross-examination he testified as follows: "Q. Then you have an insurance policy? A. No, sir. I had one but that went to the bad also. Q. Were you not protected by insurance? A. I thought I was. * * * Q. You learned from the Ætna that they had an insurance policy covering it against loss by taking acceptances? A. Yes, sir. Q. And you wanted to get the benefit of that policy, didn't you? A. I wanted an insurance policy. Q. And you found you could not get one? A. I found they would not write a second one, and the question was to arrange how I could participate in this policy, so we ultimately drafted this letter." In redirect examination he was asked, "Something has been said about insurance. Did that insurance protect you against anything except insolvency and failure to pay of the signers?" and he replied, "That is all, and even there the company would not recognize a claim made by us."

On April 16, 1925, the plaintiff made a contract with the Autocrat Company to buy some of their acceptances. By the terms of this contract it was to take such acceptances as it desired after it had verified the signatures of the acceptors and ascertained their financial standing. It was to receive one twenty-fifth of one per cent. per day as a service charge for handling the account, six per cent. per annum on the monies paid, and it was to pay to the Autocrat Company eighty per cent. of the face value of the acceptances, retaining twenty per cent. of the same. Service charges, interest, and losses, if any, were to be taken out of the twenty per cent. retained, and the balance, if any, was to be paid to the Autocrat Company when the account was closed. Under this contract the plaintiff bought acceptances of the face value of over forty thousand dollars. The acceptances on which suit was brought were among the first bought by the plaintiff, and, on April 27, 1925,

after the signature of the defendant had been verified and its credit standing ascertained, the eighty per cent. of their face value was paid to the Autocrat Company.

Mr. Blumberg further testified that they first received notice in the latter half of June, 1925, that one of the acceptances they had bought had been dishonored; that in July and August of that year they got quantities of such notices; that they stopped doing business with the Autocrat Company in June, 1925, as soon as they began to get protest notices; that he did not know that claims were made that the business methods of the Autocrat Company were irregular until after suits had been brought on the protested acceptances, which was several months later.

In cross-examination, Mr. Blumberg testified that from sixty-five to seventy per cent. of the trade acceptances they bought were protested, and that suits had been brought against all parties who had not paid; that he did not know that the Ætna Finance Company and the Autocrat Company had offices in the same building; that he did not know where the Autocrat Company did business except from the address they had in the office, and he did not know where the office of the Ætna Finance Company was; that, at the time he did business with the Autocrat Company, B. M. Ainsworth, General Manager, was the only officer of the company whom he knew; that he never made any inquiries about the business of the Autocrat Company, as to whether it manufactured the machines it sold, or as to the kind of a machine it was, that he "was not interested in that at all"; that he did not know anything about Ainsworth, he never made any inquiries about him, and he was not interested in him; that he did not know, and he never asked, as to the conditions under which the Autocrat Company sold its machines.

At the close of Mr. Blumberg's testimony the plaintiff rested.

The only witness called by the defendant was Arthur E. Sherwin. He testified that, on April 18, 1925, he was interviewed by a representative of the Autocrat Company, and, as a result of the interview, a "Special Agency Agreement" was made in writing by the defendant with the Autocrat Company for the sales right of its dishwashing machines for the period of one year from date. A duplicate of this agreement was received in evidence.

By the terms of this agreement the Autocrat Company, "at earliest convenience," was to ship to the defendant seven dishwashing machines of the total retail price of nine hundred and ninety-five dollars. The defendant was to have a discount of thirty per cent. on the retail price of all machines bought by it. The Autocrat Company also agreed to furnish free all advertising matter and supplies, and to mail letters and advertising matter to prospective customers. The agreement also contained the two following clauses:

"Said Dealer agrees to allow a commission of 10% of sales price to Company's Salesmen on sales made directly by them, take up shipments promptly, reorder machines as needed, furnish list of names for mailing and advertising and cooperate in promoting mutual interests.

"Company agrees, by special effort, to sell or cause to sell, goods listed above within 60 days from arrival of shipment, or will take back at price shown hereon and in accordance with the period of this Agency Agreement, any of such goods remaining unsold. Also will arrange to handle acceptable lease sales contracts and apply amount due thereon against acceptances given herewith until covered, thereafter payable direct to dealer."

The defendant sent a list of the names of prospective customers to the Autocrat Company. The seven machines were received by the defendant on May 22, 1925, but no salesmen from the Autocrat Company ever appeared. Some time after the machines were received the defendant wrote the Autocrat Company that no salesman had appeared, and, on the expiration of sixty days after the arrival of the machines, wrote the Company requesting it to take back the machines, but the Company did not take them back.

The testimony of the witness tended to show that this representative made false and fraudulent representations as to the construction, material, and quality of the machines. He further testified that this man made other representations, and he was asked what they were. An objection was made, and defendant offered to show, in substance, that this representative of the Autocrat Company represented to the witness that he wished the Sherwin Company to act as agent for the sale of their machines; that he wanted to make use of the Sherwin Company as headquarters for the sale of the same; that within two weeks after

the arrival of the machines a trained selling-force would come to Burlington and would sell the machines for the Sherwin Company, and that the selling force was to receive ten per cent. of the thirty per cent. profits; that the Company would send advertising matter upon being furnished a list of prospects; that none of these promises were kept; that he promised, before the acceptances were signed, that they would not be negotiated, but would be paid from funds derived from the sales of machines sold by the agents of the company. This was offered "for the purpose of showing the fraudulent scheme which caused the defendant to make the trade acceptances." This was then objected to as immaterial and inadmissible against the plaintiff. The court excluded the evidence, and the defendant was allowed an exception. The exclusion of this evidence was error.

The inference to be drawn from an examination of the record is that the court tried the case on the erroneous theory that the burden was on the defendant to prove that the plaintiff did not take the acceptances in good faith, and that it was on this theory that the court excluded the evidence. During the cross-examination of Mr. Blumberg, when an objection was made to a question asked him, the court said to counsel for the defendant: "If we had heard your evidence to substantiate things I could rule better. I realize he is testifying out of order—or out of the usual run of things—but we have not had any evidence from you except what you have had here—so far. If you have evidence to show that the buying of the acceptances was part and parcel of a scheme to buy them, and that he was not a holder in good faith, well and good. You may take what time you need to examine him, but, if you do not produce evidence about it, it will be time wasted." To this counsel said: "This set of conditions we are showing by his own testimony we say were such as to put him on his guard and put him on full inquiry"; and the court replied: "We do not think that would be enough." During the examination of Mr. Sherwin, the court said to counsel for the defendant: "The Autocrat Sales Company could not collect on these acceptances, but you will have to show that the trouble attaches to the plaintiff."

When the plaintiff proved the acceptances, and they had been received in evidence, it had made a *prima facie* case on which it could rely until the defendant introduced evidence

of fraud in the procuring of the acceptances sufficient to sup-port such a defense if the Autocrat Company were the plaintiff. Until there was such evidence of fraud in the case the testimony of Mr. Blumberg neither added to, nor detracted from, the *prima facie* case already made. When the defendant intro-duced evidence sufficient for the consideration of the jury tend-ing to show fraud in the procuring of the acceptances, then the burden was upon the plaintiff to prove by a preponderance of the evidence that it bought the acceptances in good faith. *Harponola Company* v. *Wilson,* 96 Vt. 427, 120 Atl. 895; *Howard National Bank* v. *Wilson,* 96 Vt. 438, 120 Atl. 889. On this issue the defendant would not necessarily have to pro-duce evidence tending to show a lack of good faith on the part of the plaintiff, but it could rely upon the insufficiency of the plaintiff's evidence. The excluded evidence tended to show that the defendant was induced to sign the acceptances by the fraud of the Autocrat Company, and it ought to have been ad-mitted.

The plaintiff, however, says that the error was harmless, because it admitted that there was fraud between the original parties to the acceptances. The record does not support this claim. Mr. Blumberg, in cross-examination, agreed with the examiner that the practices of the Autocrat Company were dis-honorable; but, when, in the beginning of the direct examina-tion of Mr. Sherwin, the court asked counsel for the plaintiff: "Is there any question but what the defendant was induced to sign these trade acceptances by means of fraud?" counsel re-plied: "We do not think there was any fraud; we think it was all honorable." At no time during the trial did the plaintiff admit or concede that the defendant was induced to sign the ac-ceptances by the fraud of the Autocrat Company.

The court erred in directing a verdict for the plain-tiff. The court, in directing the verdict, said: "Notwithstand-ing what was done when the trade acceptances were procured, the evidence is undisputed and, if believed, is sufficient to show that the plaintiff was a holder for value in due course, in good faith; and we believe the evidence is such that that should be decided as a matter of law."

Under the Negotiable Instruments Act, negligence on the part of the plaintiff in purchasing negotiable paper or suspicious circumstances sufficient to put a prudent man on

inquiry, will not of themselves prevent a recovery, but are to be considered merely as evidence bearing on the question of bad faith. *Howard National Bank* v. *Wilson, supra.*

It is ordinarily to be expected in these cases that the purchaser will testify to his good faith and want of notice, as was done in this case, and that the defendant is compelled to rely upon the circumstances surrounding the purchase and the inferences to be drawn therefrom to rebut such showing.

In *Arnd* v. *Aylesworth,* 145 Iowa, 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638, the court, in discussing the rule, say: "These authorities, and many others which might be cited, uphold with much unanimity the rule, as we have stated it, that neither negligence, nor knowledge of suspicious circumstances, nor failure to inquire into the consideration, will in or of itself be bad faith in a holder of negotiable paper who purchases it in the ordinary course of business; but they are equally consistent in holding that the existence of such facts may be evidence of bad faith sufficient to take the question to the jury, and especially is this so where the burden is upon the holder to establish the innocent character of his purchase." And in *Goodman* v. *Simonds,* 20 How. 343, 15 L. ed. 934, the Court say: "Every one must conduct himself honestly in respect to the antecedent parties, when he takes negotiable paper, in order to acquire a title which will shield him against prior equities. While he is not obliged to make inquiries, he must not wilfully shut his eyes to the means of knowledge which he knows are at hand, * * * for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith."

The testimony of Mr. Blumberg is not corroborated by any witness; he was dealing with total strangers; he was satisfied that the Autocrat Company was not a concern of financial responsibility, yet he made no investigation of the moral standing or general reputation of the people claiming to be the Autocrat Company nor as to their business methods—he was not interested in those matters; he made no investigation as to the kind of machines the Company sold, nor as to whether it made them or was merely a selling concern, and he knew nothing about the Company's place of business aside from the address he had in his office. He did not try to find out how the Company sold its machines, although the statement on the face of the acceptances that the obligation of the acceptor *arose* from the purchase

of goods from the drawer would naturally have caused a man of his profession and experience to make such an investigation. An investigation would have disclosed the ''Special Agency Agreement,'' a reading of which would probably have caused him to refuse to buy the acceptances. He placed no reliance upon the integrity or financial standing of the Autocrat Company, but refused to purchase any acceptances until he had verified the signatures of the acceptors and ascertained their financial standing. In addition to this he insisted that he should have credit insurance which would protect him from loss by reason of the non-payment of any of the acceptances he bought; and, when he paid for the acceptances he retained twenty per cent. of their face value to cover expenses, which included losses resulting from the non-payment of acceptances and the cost of maintaining suits on acceptances which were not paid.

These are some of the circumstances surrounding the purchase of the acceptances by the plaintiff, and, from a consideration of them, we think that it cannot be said that only an inference favorable to the plaintiff could reasonably be drawn from the evidence.

*Reversed and remanded.*